REED *v.* LEE.

5-2987                                                 372 S. W. 2d 234

Opinion delivered October 28, 1963.

[Rehearing denied December 2, 1963.]

*Thomas B. Tinnon,* for appellant.

*Nell Powell Wright,* for appellee.

CARLETON HARRIS, Chief Justice. The facts in this case are somewhat complicated. Appellant, H. W. Reed[1] has at all times pertinent hereto been the owner of some 6,000 acres of land in Baxter County. Carl W. Lee, one of the appellees herein, is a real estate broker, living in Bentonville, Arkansas. Reed did not actually list the 6,000 acres with Lee, but did authorize the latter to sell it. Reed also had for sale 532 head of cattle. During the months of June and July, 1961, Lee and another realtor, Omar Head, of Amarillo, Texas, (also an appellee herein) arranged a transaction by which Reed would exchange his Baxter County property for a Texas Hotel owned by Grey Investment Company of Eastland, Texas, (third appellee herein). Don Pierson was President of Grey. However, Reed, a resident of Alvarado, California, desired to dispose of his non-California investments, and he, therefore, would only agree to the trade if the hotel

---

[1] Mabel C. Reed, wife of H. W. Reed, is also an appellant, but has been treated throughout the litigation as only a nominal party, since no special pleadings have been filed on her behalf, nor any defense raised distinctive from that of her husband. We, accordingly, hereafter will use only the singular term, "appellant."

could also be sold. Head arranged a trade of the hotel for 2.4 acres in Amarillo, Texas, owned by J. W. Bragg of Amarillo, together with a monetary payment on the part of Bragg.

On August 7, 1961, two contracts were prepared in Head's office in Amarillo, both being dated August 8, since the 7th was a Sunday. Under the first contract, Reed agreed to trade his Baxter County land for Grey's hotel. The contract recited that the parties had deposited $5,000.00 with realtors Lee and Head, and further provided that these brokers would receive a total commission of $10,000.00 for their services. The provision reciting that $5,000.00 had been deposited was admittedly erroneous. Under the second contract, Reed agreed to trade the newly acquired hotel to Bragg in exchange for Bragg's 2.4 acres of land, and the sum of $130,000.00, payable in monthly payments of $780.00 each. This contract was executed by both Reed and Bragg at the time, but there is a notation on the agreement, "contingent on trade with Don Pierson." The contract between Reed and Pierson was not executed at that time; in fact, Pierson was not present, but was represented at the meeting by Head. Reed then flew back to California, taking both contracts with him.

The next day, August 8, Reed consulted his attorney, James R. Slaybaugh, lawyer of Hayward, California, and directed him to delete the erroneous recital about the $5,000.00 payment to Lee and Head,[2] and further instructed Slaybaugh to prepare a Supplemental Commission Agreement (hereinafter called S.C.A.), which provided that the $10,000.00 commission to be paid to Lee and Head (heretofore referred to) would only be paid when the 2.4 acres involved in the contract with Bragg had been sold at a net of $50,000 to Reed, such sale to be made within two years. Slaybaugh then inserted in the Reed-Grey contract a reference to the S.C.A. and mailed this contract and the S.C.A., both signed by Reed, to Head, directing that Head retain signed copies and re-

---

[2] Slaybaugh overlooked making this deletion.

turn copies of the contracts if acceptable. In chronological order the following events then transpired:

August 10: Head called Reed with reference to the S.G.A., stating that it was unacceptable and tried to get Reed to change the agreement. Reed refused to do so. It does not appear from the conversation, however, that either party considered that the S.C.A. had been definitely or finally rejected.

August 15: Because Reed had asserted that he did not have the cash money to pay the commission at the outset, Lee called Reed and suggested that $5,000.00 of the commission might be obtained from a sale of the cattle. Reed agreed.

August 16: Reed telegraphed Lee wherein he confirmed the conversation by which he agreed to pay $5,000.00 if the cattle should be sold for $85,000.00.

August 20: Lee obtained a firm offer from Norman Gibson, Weatherford, Texas, of $85,000.00 for the cattle.

August 24: Lee, Head, and Pierson signed the Reed-Grey contract.[3]

August 25: Lee contracted Clayton Little, an attorney of Bentonville, Arkansas, who called Slaybaugh relative to Lee's concern over the recitation that the brokers had already received $5,000.00. Lee desired to either receive the $5,000.00 or obtain an acknowledgment from Reed that the amount had not been paid.

August 28: Little again called Slaybaugh, and according to his (Little) testimony, told Slaybaugh that Lee had obtained the offer of $85,000.00 from Gibson for the cattle and further advised that the S.C.A. was acceptable to appellees, Lee and Head, "that we had everything completed on this end." Slaybaugh, subsequently, in a deposition, denied that he had been advised that

[3] The contract recited that Reed should pay Head and Lee "as per supplemental agreement" and that Pierson should pay to the brokers $10,000.00. The contract also contained the erroneous provision that brokers had already received $5,000.00 from Reed. Lee stated that he signed the contract because Pierson would not sign otherwise.

either the Reed-Grey contract or the S.C.A. had been accepted or executed. According to his testimony, the conversation related only to clarifying the S.C.A., and its effect upon the commission terms of the Reed-Grey contract. As he stated, ''All this suggested to me that there had been no action taken by his clients at that time.'' In the deposition, Slaybaugh denied that he was an agent for Reed or had any authority to act for appellant in the matter.

August 29: Reed wired Little, Lee, and Pierson, withdrawing his offer to sell the Baxter County lands.

August 30: Lee and Head instituted suit against appellant, seeking judgment for $15,000.00 ($10,000.00 for the real estate transactions and $5,000.00 for the sale of the cattle).

September 20: Grey Investment Company, through its president, Don Pierson, instituted suit against appellant in the Baxter County Chancery Court, asking specific performance.

Following the filing of an answer and certain motions, the causes were consolidated for trial, and heard by the Chancellor. Thereafter, the Court made the following findings:

That the contract between Grey Investment Company and H. W. Reed was executed by all parties prior to the attempted cancellation by Appellant Reed through telegram from Reed's attorney, dated August 29, 1961; that Grey Investment Company was entitled to specific performance of the contract; that Head and Lee had agreed to the terms of the S.C.A., and their agreement was communicated to Slaybaugh prior to the attempted cancellation of the original contract; that the S.C.A. had been modified by communication between Reed on the one hand, and Head and Lee on the other, to the extent that these appellees would receive $5,000.00 of the commission at the time of the exchange of the Baxter County property for the hotel property, and that the remaining $5,000.00 of the commission would be due

upon the sale of the 2.4 acres of land in Amarillo, Texas, such sale to be made within a two-year period, and in an amount which would net Reed $50,000.00 after payment of the commission.

The court further found that Head and Lee were entitled to judgment for $5,000.00 already earned under the terms of the contract, but that they were not entitled to a commission for the sale of the cattle, inasmuch as Reed's agreement to pay the first $5,000.00 due (because of the sale of the Baxter County lands) was conditioned on Head and Lee securing a buyer for the cattle at the stipulated price; that these appellees did obtain such a buyer. From the decree entered embodying these findings, and directing Reed to immediately perform the contract dated August 8, 1961, appellant brings this appeal.

Appellant asserts that appellees did not agree to, or accept, the contract prior to the telegram that he caused to be sent on August 29, and, in his argument, Reed states that up until the time of the trial, no written communication, or signed copy of the Grey contract, or the S.C.A., was ever received by him. It is true that Lee and Head did not sign the S.C.A. and send it on to Reed, but they explained that this would have been futile, since the telegram was received from Slaybaugh (for Reed), revoking the offer to sell or exchange. Under the circumstances this explanation appears logical. For that matter, the terms of the S.C.A. were orally varied from time to time by the parties. Reed testified that on August 15 he had agreed that, if the cattle were sold, he would pay $5,000.00 "of it." He explained the "it" as relating to the Grey real estate transaction:

"Of the Ten Thousand Dollars on the real estate, on the supplemental agreement, right, instead of them waiting for that $10,000.00 they would get $5,000.00 immediately and the other five if and when they sold the land in Amarillo.

Q. Then as far as you were concerned if he sold the cattle at Eighty-Five Thousand Dollars ($85,000.00) it was a completed deal then?

A. That is right, if they accepted the supplemental agreement as revised to $5,000.00.''

Pierson, Lee, and Head all testified that Pierson executed the contract on the 24th of August. Of course, Reed had already signed the contract with Grey Investment Company, along with the supplemental agreement, following his return to California, after viewing the property. Let it be borne in mind that there was no dispute between Reed and Pierson; the Pierson, or Grey Investment Company, contract was only being held up because Reed had demanded that his terms be met under the S.C.A. before the Pierson contract would become effective. In other words, the closing of all agreements was simply dependent upon Lee and Head accepting the S.C.A. The only additional requirement made by Reed (that the cattle would have to be sold if he paid the $5,000 immediately), of course, did not relate to the Grey Investment Company contract at all. Accordingly, the pertinent question in this litigation is whether Lee and Head accepted the S.C.A. Here, the testimony was in conflict. Clayton Little testified that Lee came to his office on August 25 and asked him (Little) to contact Mr. Slaybaugh, and tell the latter that Pierson had signed the contract, but that Lee was concerned over the fact that the contract recited that Reed had already paid $5,000 to this appellee. In calling Slaybaugh, Little also testified that he told the California attorney that Lee had a firm offer for the sale of the cattle. On August 28, Little again called Slaybaugh and told him that the supplemental agreement was acceptable to both Lee and Head, ''and that he had at that time had the firm offer or completed the cattle sale contract for $85,000.00 and I again told Mr. Slaybaugh that now that everything was worked out I still wanted him to go ahead and send the $5,000.00 as called for in the contract or to send us a wire acknowledging that it hadn't been sent—that we had everything completed on this end.''

Little said that Slaybaugh stated that he would convey the information received from Little to Reed.

Reed testified that he called Slaybaugh and asked if he had "heard anything," and that his lawyer replied, "No, nothing except that this other Attorney * * * had called him asking him about this Five Thousand Dollars ($5,000.00), to delete that and at that time he explained it was supposed to have been deleted at the time * * *." Reed stated that he then decided that "the deal is not going to go through" and he dictated the telegram advising that he was revoking the offer to sell. Slaybaugh testified that his conversation with Little related entirely to clarification of the supplemental agreement (the matter of the $5,000, heretofore mentioned). This was a question of fact, and the Chancellor accepted the testimony of Little.

Actually, Reed's testimony in court indicates that the telegram was not actually meant to be a final and absolute revocation of the offer. The record reveals the following during the examination of Reed:

"Q. Did you receive any communication or any indication from anyone even after you sent that telegram prior to the time that you were served with notice of this lawsuit that anyone wanted to go ahead with the transaction?

A. Not one word, if anything I thought this telegram would get some kind of answer and *some kind of action*[4] but I never heard one word and I thought it was water under the bridge until three or four weeks later, I don't know, at the time it was served and I got this special delivery letter and I think it was the latter part of September."

Appellant argues that Slaybaugh was not an agent for Reed, and that, even if Little actually notified Slaybaugh of the acceptance of the agreement, same was not binding upon Reed since appellant himself did not receive such notice from appellees or their attorney. The

---

[4] Emphasis supplied.

question of whether Slaybaugh was an agent of Reed, as that term is generally used, is not important in this litigation. Certainly, he was an agent to the extent of having authority to communicate to Reed any information given him relative to the acceptance of the contract by appellees. Such authority would be unquestioned since Reed had Slaybaugh act for him, in communicating his desires relative to the contracts from the beginning to the conclusion (Slaybaugh even sending the telegram of revocation).

One fact stands out; after all is said and done, Reed, on August 29, was in a position to receive everything that he had sought during the course of the negotiations, *i.e.*, he was disposing of his Arkansas property; he was disposing of the Eastland Hotel property in Texas; a sale had been obtained for his cattle, which he demanded as a prerequisite to paying the $5,000.00 to the brokers immediately; he did not owe the additional $5,000.00 until the Bragg property was disposed of.[5]

As stated at the outset, the facts in this litigation are complicated, and are very much in dispute. The Chancellor, after hearing all of the evidence made the findings previously set out. The rule that we will not disturb the Chancellor's findings unless they are clearly against the preponderance of the evidence, is so well established as to require no citation of authority. There are some facts, presented on each side, which tend to support the position of each. We think a preponderance lies with appellees, but, in any event, we certainly cannot say that the Chancellor's findings are against a preponderance of the evidence.

Affirmed.

---

[5] Under the terms of the supplemental agreement, Reed was to receive $50,000.00 net for this property, and Head and Lee were given two years to make the sale.